IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN R. MIDDLEMAS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )       Civil Action No. 08-621 |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

### I. INTRODUCTION

Pending before the Court are cross-motions for summary
judgment filed by Plaintiff John R. Middlemas and Defendant Michael
J. Astrue, Commissioner of Social Security. Plaintiff seeks review
of final decisions by the Commissioner denying his claim for
disability insurance benefits ("DIB") under Title II of the Social
Security Act, 42 U.S.C. §§ 401 *et seq.* For the reasons discussed
below, Defendant's motion is denied and Plaintiff's motion is
granted insofar as he seeks remand for further consideration by the
Commissioner.

### II. BACKGROUND

#### A. Factual Background

John Middlemas was born on July 26, 1951, and graduated
from high school in 1969. (Certified Copy of Transcript of
Proceedings before the Social Security Administration, Docket No.

1

5, "Tr.," at 80.) In 1973, he went to work for a steel manufacturing company as a "tongsman," a job which required moving rolls of steel weighing more than 100 pounds from one location in the mill to another. (Tr. 371.)

In 1991, Mr. Middlemas was injured on the job and underwent back surgery to remove ruptured discs in the lumbar region of his spine. (Tr. 109; 116.) Although he did well after surgery, he had only partial relief of his symptoms. In January 1994, he underwent a second diskectomy after he suffered another disk herniation at L5-S1 and had no relief from more conservative measures such as physical therapy. (Tr. 120, 133.)

During this period, Plaintiff continued to work as a guard at the steel plant, although he described that job as largely make-work. For about a month, Mr. Middlemas attempted working in the company accounting department, but was returned to his guard job because he was unable to perform the computer-related tasks the office position required. (Tr. 381-382.) In 1997, Plaintiff was told the company was eliminating the light duty jobs such as his; because he could not return to his previous heavy work as a tongsman, he was laid off. (Tr. 375.)

In April 1998, Mr. Middlemas was diagnosed with a central- to left-disk herniation at L4-L5 and disk bulging at L3-L4 and L5-S1. (Tr. 136.) Dr. J. William Bookwalter, a neurosurgeon, treated Plaintiff regularly throughout this period and ultimately diagnosed

2

him with progressive degenerative disc disease, specifically chronic S-1 radiculopathy[1] on the left without any acute findings. (Tr. 148.)

By 2001, Mr. Middlemas was no longer able to work in any capacity. His brother loaned him money on several occasions, and eventually hired him as a part-time consultant for his family's non-profit foundation. In early 2002, Mr. Middlemas was diagnosed with retroperitoneal fibrosis, a disorder in which the ureters are blocked by a fibrous mass at the back of the abdomen.[2] (Tr. 272, 277-279.) After unsuccessful treatment with the drug tamoxifen, Plaintiff underwent surgery to place bilateral stents in his ureters. Between January 10, 2002, and June 2, 2004, Plaintiff

---

[1] Radiculopathy is a generic term describing any pathological condition of the nerve roots. *See* dictionary.reference.com (last visited February 16, 2009.)

[2] Retroperitoneal fibrosis is a rare disorder of unknown etiology. It most commonly develops between the ages of 40 and 60; men are twice as likely as women to develop it. It may cause chronic obstructive uropathy when the fibrous mass presses on one or both ureters. Early symptoms include dull abdominal pain increasing over time, swelling of the legs, decreased circulation in the legs leading to pain and discoloration, and severe abdominal pain with hemorrhage due to ischemic bowel. Later symptoms include decreased urine output, anuria, nausea, vomiting, and changes in thinking caused by kidney failure and the resulting build-up of toxic chemicals in the blood. The disorder is diagnosed via serum BUN and creatinine tests showing elevated levels, ultrasound showing distention of the kidney due to fluid accumulation, excretory urography showing compression and deviation of the ureters, abdominal CT scan or MRI, or biopsy. Conservative treatment includes corticosteroids or tamoxifen; if these are unsuccessful, surgery to insert ureter stents may be required. The prognosis depends on the extent of the fibrosis and the amount of damage to the kidneys. *See* the medical encyclopedia at the National Institute of Medicine's website, www.nlm.nih.gov/medlineplus (last visited February 16, 2009), "Medline Plus."

3

underwent the same surgery approximately every five months.

Plaintiff's treating urologist, Dr. Thomas M. Jaffe, recommended a different plan of attack in June 2004. Mr. Middlemas subsequently underwent a bilateral ureterolysis to remove adhesions on his ureters, ureteroureterostomy, and right ureterorrhaphy;[3] these procedures required hospitalization for approximately 10 days. On November 11, 2004, Plaintiff's bilateral stents were permanently removed. (Tr. 209; 224-225.) Despite these operations, Plaintiff continued to have frequent kidney pain and the need to urinate very often.

According to Plaintiff's brother, as his health continued to deteriorate, Mr. Middlemas was no longer able to perform even the few duties he had for the foundation and the arrangement was terminated. His brother wrote, "If John were not my brother, the position would never have been created. He was neither qualified nor physically capable of doing the job, and I would have dismissed him under ordinary circumstances. . . . His health is such that I believe he is unemployable under any circumstances." (Tr. 55.)

B.  Procedural Background

On May 9, 2006, Mr. Middlemas applied for disability insurance benefits, claiming he was disabled as of December 31,

---

[3] Ureteroureterostomy is defined as the surgical establishment of an artificial communication between two ureters or between different parts of the same ureter. Ureterorrhaphy is the surgical operation of suturing a ureter. See dictionary.reference.com (last visited February 16, 2009.)

4

2002, as a result of retroperitoneal fibrosis, kidney failure, herniated discs and degenerative disk disease. (Tr. 74.) His application was initially denied on July 21, 2006 (Tr. 50-53), after which Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ.")

On October 30, 2007, a hearing was held before the Honorable James J. Pileggi at which Plaintiff was represented by counsel. Judge Pileggi issued his decision on February 26, 2008, again denying benefits. (Tr. 11-19.) The Social Security Appeals Council declined to review the ALJ's decision on April 24, 2008, finding no reason pursuant to its rules to do so. (Tr. 4-6.) Therefore, the February 26, 2008 opinion became the final decision of the Commissioner for purposes of review. 42 U.S.C. § 405(h); Rutherford v. Barnhart, 399 F.3d 546, 549-550 (3d Cir. 2005), citing Sims v. Apfel, 530 U.S. 103, 107 (2000). Plaintiff filed suit in this Court on May 7, 2008, seeking judicial review of the ALJ's decision.

## C. Jurisdiction

This Court has jurisdiction by virtue of 42 U.S.C. § 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the plaintiff resides.

### III. **STANDARD OF REVIEW**

The scope of review by this Court is limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). Findings of fact by the Commissioner are considered conclusive if they are supported by "substantial evidence," a standard which has been described as requiring more than a "mere scintilla" of evidence, that is, equivalent to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, id. at 401. "A single piece of evidence will not satisfy the substantiality test if the [ALJ] ignores, or fails to resolve a conflict, created by countervailing evidence." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).

This Court does not undertake *de novo* review of the decision and does not re-weigh the evidence presented to the Commissioner. Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006), *citing* Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986) (the substantial evidence standard is deferential, including deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence.) If the decision is supported by substantial evidence, the Court must affirm the

6

decision, even if the record contains evidence which would support a contrary conclusion. <u>Panetis v. Barnhart</u>, CA No. 03-3416, 2004 U.S. App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), *citing* <u>Simmonds v. Heckler</u>, 807 F.2d 54, 58 (3rd Cir. 1986), and <u>Sykes v. Apfel</u>, 228 F.3d 259, 262 (3rd Cir. 2000).

## IV.  **LEGAL ANALYSIS**

### A.  The ALJ's Determination

In determining whether a claimant is eligible for a period of disability and to receive disability insurance benefits, the burden is on the claimant to show that he has a medically determinable physical or mental impairment (or combination of such impairments) which is so severe he is unable to pursue substantial gainful employment[4] currently existing in the national economy. The impairment must be one which is expected to result in death or to have lasted or be expected to last not less than twelve months. 42 U.S.C. § 1382c(a)(3)(C)(i); <u>Morales v. Apfel</u>, 225 F.3d 310, 315-316 (3d Cir. 2000). A claimant seeking DIB must also show that he contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he was last insured. 42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a). The Commissioner does not dispute that Mr. Middlemas satisfied the first two non-medical

---

[4]  According to 20 C.F.R. § 416.972, substantial employment is defined as "work activity that involves doing significant physical or mental activities." "Gainful work activity" is the kind of work activity usually done for pay or profit.

7

requirements, and the parties agree that Plaintiff's date last insured was December 31, 2004.

To determine a claimant's rights to DIB,[5] the ALJ conducts a formal five-step evaluation:

(1) if the claimant is working or doing substantial gainful activity, he cannot be considered disabled;

(2) if the claimant does not suffer from a severe impairment or combination of impairments that significantly limits his ability to do basic work activity, he is not disabled;

(3) if the claimant does suffer from a severe impairment which meets or equals criteria for an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") and the condition has lasted or is expected to last continually for at least twelve months, the claimant is considered disabled;

(4) if the claimant retains sufficient residual functional capacity ("RFC") to perform his past relevant work, he is not disabled; and

(5) if, taking into account his RFC, age, education, and past work experience, the claimant can perform other work that exists in the local, regional or national economy, he is not disabled.

20 C.F.R. § 416.920(a)(4); see also Morales, 225 F.3d at 316.

In steps one, two, and four, the burden is on the claimant to present evidence to support his position that he is entitled to Social Security benefits, while in the fifth step the burden shifts to the Commissioner to show that the claimant is capable of

---

[5] The same test is used to determine disability for purposes of receiving either DIB or supplemental security income benefits. Burns v. Barnhart, 312 F.3d 113, 119, n.1 (3d Cir. 2002). Therefore, courts routinely consider case law developed under both programs.

performing work which is available in the national economy.[6] <u>Sykes</u> <u>v. Apfel</u>, 228 F.3d 259, 263 (3d Cir. 2000).

Following the prescribed analysis, Judge Pileggi first concluded that Mr. Middlemas had not engaged in substantial gainful activity during the period December 31, 2002, through his date last insured, December 31, 2004. (Tr. 13.)

Resolving step two in Plaintiff's favor, the ALJ found that his severe impairments included degenerative disc disease of the lumbar spine and a history of acute renal failure secondary to obstructive uropathy due to retroperitoneal fibrosis. (Tr. 13.) At step three, the ALJ concluded Plaintiff's degenerative disk disease did not meet the requirements of Listing 1.00, pertaining to the musculoskeletal system, nor did the medical evidence of record support the conclusion that his urinary condition satisfied Listing 6.02, impairment of renal function.

At step four, the ALJ concluded that Mr. Middlemas had the residual functional capacity to perform light work with the condition that he must "be in close proximity to restroom facilities." (Tr. 15.) The ALJ further concluded that due to his exertional limitations, Plaintiff could not perform his previous work as a laborer in a steel mill which the which the vocational expert ("VE") at the hearing, Mary Beth Kopar, had described as

---

[6] Step three involves a conclusive presumption based on the listings, therefore, neither party bears the burden of proof at that stage. <u>Sykes</u>, 228 F.3d at 263, n2, *citing* <u>Bowen v. Yuckert</u>, 482 U.S. 137, 146-147 n.5 (1987).

9

unskilled, very heavy work. (Tr. 17; *see also* Tr. 390.)[7]

In response to the ALJ's hypothetical questions at the hearing, Ms. Kopar testified there were unskilled light-level jobs generally available in the national economy such as a sorter, order caller, or marker, all of which could be performed by an individual of Mr. Middlemas's age, education, and other limitations. (Tr. 25; *see also* Tr. 390.) Based on Plaintiff's age,[8] his high school education, the ability to communicate in English, a history of work which did not provide transferrable skills, the medical evidence of record, and the testimony of the VE, the ALJ determined at step five that Mr. Middlemas was not disabled at any time from December 31, 2002, through December 31, 2004, and, consequently, not entitled to benefits. (Tr. 18.)

## B. Plaintiff's Arguments

Plaintiff raises three arguments in his brief in support of his motion for summary judgment. (*See* Doc. No. 12, "Plf.'s Brief.") First, the ALJ improperly substituted his own medical judgment for the opinion of Plaintiff's treating physicians, in particular his conclusion that Plaintiff's only limitation

---

[7] Although the ALJ and the VE discussed Plaintiff's short tenure working part-time as a consultant with his brother's foundation (Tr. 390-391), the ALJ stated no conclusion either at the hearing or in his decision regarding Plaintiff's ability to return to that or a similar occupation.

[8] Plaintiff was 53 years on his date last insured, making him a person "closely approaching advanced age" according to Social Security regulations. 20 C.F.R. §§ 404.1563(d).

10

resulting from his retroperitoneal fibrosis is the need to be near a restroom. Because his urinary stents must be replaced regularly, Plaintiff can anticipate being unable to work for periods of up to ten days two or three times a year. Plf.'s Brief at 6-7.) Second, the ALJ failed to give proper weight to Plaintiff's subjective complaints of pain and provided an evaluation which was based on an incomplete and biased reading of the medical record and Plaintiff's report of his activities of daily living ("ADL.") (Id. at 7-12.) Third, the ALJ's hypothetical question to the vocational expert was improper in that it failed to include all the limitations posed by Mr. Middlemas's medical conditions. In particular, the hypothetical question was deficient because it assumed he could perform light work, a level of residual functional capacity which is not supported by the medical evidence; it did not incorporate Plaintiff's need to use the restroom at a frequency which might not be tolerated by an employer; and it failed to identify any limitations due to Plaintiff's chronic back and flank pain. Finally, the hypothetical question did not take into account the fact that Mr. Middlemas would regularly miss six to ten days of work approximately every five months in order to have his stents replaced. (Id. at 12-14.) Mr. Middlemas argues that any of these errors alone is sufficient cause to remand for further consideration by the Commissioner.

In order to provide a less repetitive analysis of the ALJ's

11

decision, we have reorganized Plaintiff's arguments into two broader topics: (1) the ALJ's unsupported conclusion that Mr. Middlemas retained the residual functional capacity to perform light work despite chronic pain in his back and flank areas, and (2) the consequential effect of this error on the ALJ's hypothetical question to the vocational expert.

1. *The ALJ's RFC analysis:* In his decision, the ALJ concluded that Mr. Middlemas "had the residual functional capacity to perform light work except [he] was required to be in close proximity to restroom facilities." (Tr. 15.) We find that although the ALJ properly set out the relevant Social Security regulations and cited the appropriate Social Security Rulings ("SSR"),[9] the analysis failed to consider the cumulative effects of Plaintiff's back and flank pain on his "maximum remaining ability to perform work on a regular and continuing basis, i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-9.

In arriving at the conclusion about a claimant's residual functional capacity, an ALJ is required to consider all relevant evidence, e.g., medical records, comments by the claimant's medical

---

[9] "Social Security Rulings are agency rulings published 'under the authority of the Commissioner of Social Security' and 'are binding on all components of the Social Security Administration.'" Sykes, 228 F.3d at 271, *citing* 20 C.F.R. § 402.35(b)(1); Williams v. Barnhart, No. 05-5491, 2006 U.S. App. LEXIS 30785, * 8 (3d Cir. Dec. 13, 2006). "Rulings do not have the force and effect of the law or regulations but are to be relied upon as precedents in determining other cases where the facts are basically the same." Sykes, id., *quoting* Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984).

providers and other observers, and the claimant's own reports. Fargnoli v. Halter, 247 F.3d 34, 40 (3d Cir. 2001), defining RFC as "that which an individual is still able to do despite the limitations caused by his or her impairment[s]." The first step of the RFC assessment is to identify the claimant's functional limitations and assess his work related abilities on a "function by function basis." SSR 96-8p, "Assessing Residual Functional Capacity in Initial Claims." This analysis requires consideration of both exertional and non-exertional capacities of the individual. Id. Exertional capacity describes the individual's ability to perform each of seven physical strength demands, i.e., sitting, standing, walking, lifting, carrying, pushing, and pulling, and each function must be considered separately. Non-exertional capacity refers to "all work-related limitations and restrictions that do not depend on an individual's physical strength" such as psychological or mental limitations; postural, manipulative, visual, and communicative, restrictions; and the claimant's ability to tolerate various environmental factors. Id.; 20 C.F.R. § 404.1569a(c). Where a subjective symptom, such as pain, affects the capacity to perform exertional functions, it should be considered as part of that analysis; where it causes a psychological effect, e.g., diminution of the ability to concentrate, it should be consider in that context.

In the section of his decision addressing Plaintiff's RFC, the

13

ALJ relied on three sources: Plaintiff's ADL questionnaire, his testimony at the hearing, and the medical evidence regarding his degenerative disk disease and retroperitoneal fibrosis. (Tr. 16-17.) We agree with Plaintiff that the ALJ's analysis in each instance was less than complete. We also find his statement that Mr. Middlemas's "medically determinable impairments could have been reasonably expected to produce the alleged symptoms, but that [his] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible" to be so conclusory as to be beyond meaningful review, particularly because the ALJ entirely omitted any substantive analysis of the effects of Plaintiff's pain.

From the ADL questionnaire completed in June 2006, the ALJ drew the following facts: Plaintiff could walk half a mile, sit for 30 minutes, lift and carry approximately 10 pounds, and could dress and shower without resting. (Tr. 16.) But the questionnaire also reflects that reaching to dry his hair caused soreness in Plaintiff's back and left arm; he could do no yard work or household chores except cooking which "takes time but is accomplished;" and tasks requiring extended periods of standing (e.g., washing dishes) resulted in "stabbing" pain in his kidney area as well as in his back and leg. He could not change his cat's litter box because he could not stoop and bend; he needed to rest 15-20 minutes between activities; and above-average exertion

14

resulted in back and leg pain, weakness and cramps in his left leg, and pain in the kidney area. Sitting for longer than 30 minutes also resulted in back pain and leg cramps. He could only walk 15-20 minutes before needing to rest. Although the fatigue he began experiencing in 2001 when he developed retroperitoneal fibrosis had decreased since his surgery, he still experienced intermittent fatigue every day, particularly after performing small tasks, waking up, and at bedtime. Pain in his lower back, buttocks, left leg, kidney area, and left arm[10] were exacerbated by bending, standing, walking, reaching, and sitting for long periods of time. He occasionally slept on the floor to ease his back and kidney area pain, and used a TENS unit for his back. (*See* Tr. 82-89.) In short, a comprehensive summary of Plaintiff's activities of daily living questionnaire presents quite a different picture from that derived by the ALJ.

Similarly, from the testimony at the hearing, the ALJ noted that prior to his date last insured, Mr. Middlemas could prepare diner, wash dishes while taking breaks, and has no problems driving.[11] He needed to urinate approximately every hour and a

---

[10] Mr. Middlemas began reporting pain in his left arm to his primary care physician in 2006. *See* Tr. 164-165. There are no reports of such an impairment prior to Plaintiff's date last insured.

[11] Plaintiff actually testified that he had no medical condition that would prevent him from operating a motor vehicle safely. (Tr. 366.) In his ADL questionnaire, he stated he could drive locally but experienced discomfort in his back and left leg getting in and out of the car and needed to take a break every 45 minutes on longer car trips. (Tr. 83-84.)

half, but since his surgery, he has not needed stents.[12] He cannot take pain pills and takes only over the counter medications. He has pain in his back and legs and cramps in his left calf. (Tr. 16-17.) These are all accurate reflections of Plaintiff's testimony, but again, there are significant omissions: Plaintiff testified that he has "a good bit" of pain in his kidneys, with feelings of cramps or being swollen. He is limited in the type of medications he takes because "they could set off kidney failure or whatever," and must be careful when undergoing an MRI because the dyes used could affect his kidneys. His back pain has not changed despite two surgeries, and since the second operation, he has experienced constant cramps and twitching in his left calf muscles. No further surgery was anticipated, however, because the medications he would have to take in connection with it could potentially affect his kidneys. In discussing his ability to prepare dinner prior to his date last insured, Plaintiff testified that in order to have dinner ready at 5:30, he would begin at 1:00 because he could stand only 10 minutes before pain in his back and kidneys would require him to take a break. (Tr. 387-388.)

---

[12] According to the medical record and his own testimony, after Mr. Middlemas underwent major surgery on his ureters in June 2004 and the later removal of the bilateral stents in November 2004, he no longer needed the stent emplacement and removal procedure every three to six months. (See Tr. 385-386; 222-226; 209-210; 213-214.) Therefore, the medical record does not reflect the likelihood that Plaintiff would continue to require repeated surgical procedures. We have therefore omitted any analysis pertaining to Plaintiff's argument that the ALJ failed to consider the absenteeism which would result from periodic stent replacement.

16

Finally, there is no medical evidence to dispute Plaintiff's claims of constant pain in the kidney area and lower back. In fact, a comprehensive reading of the medical record supports Mr. Middlemas's testimony that although his kidney pain improved following major surgery, it was not eliminated by his date last insured and, in fact, continued through at least June 2006. *See*, e.g., complaints of flank pain on July 12, 2004, November 11, 2004, November 18, 2004, and May 11, 2006, at Tr. 248, 350, 351, and 356, respectively. Similarly, there is evidence of ongoing lower back pain. *See* e.g., Tr. 145, reporting back pain, pain going down his left leg with spasms in his calf on November 7, 2001; electrical evidence of chronic S-1 radiculopathy on left, without acute denervation signs; and Tr. 193, reporting "low back pain which is chronic," on August 14, 2002, no radiation down his legs and "a little tweak in his back" which was gradually getting better.

None of this evidence regarding ongoing pain and other non-exertional postural limitations such as bending, stooping, or reaching is discussed in the ALJ's decision. He does not arrive at a specific conclusion regarding Plaintiff's ability to perform any of the seven exertional activities (sitting, standing, walking, lifting, carrying, pushing, and pulling), nor explain the basis for his conclusion that Plaintiff satisfies the requirements for performing light work. According to the Social Security Administration,

17

> [l]ight work involves lifting no more than 20 pounds at
> a time with frequent lifting or carrying of objects
> weighing up to 10 pounds. Even though the weight lifted
> may be very little, a job is in this category when it
> requires a good deal of walking or standing, or when it
> involves sitting most of the time with some pushing and
> pulling of arm or leg controls. To be considered capable
> of performing a full or wide range of light work, [the
> claimant] must have the ability to do substantially all
> of these activities.

20 C.F.R. §§ 404.1567(b) and 416.967(b). A person who is able to
do light work is also assumed to be able to do sedentary work
unless there are limiting factors such as loss of fine dexterity or
the inability to sit for long periods of time. Id.

There is only one reference in the record to Plaintiff's
ability to do any specific measure of work. On July 12, 2006, a
state agency physician concluded that Plaintiff could lift and
carry 50 pounds occasionally and 25 pounds frequently, and could
sit, stand and/or walk about 6 hours in an 8-hour workday. (Tr.
25.) However, nothing in the medical records or the ADL
questionnaire supports these conclusions. Noting the limitations
identified by Plaintiff in his ADL questionnaire, the physician
commented on his complaints of

> constant pain of the kidneys and back. Bending,
> standing, walking, sitting, and lifting increase his
> pain. He states that he can no [sic] sit for long and
> can not lift anything. He reports that he has had to
> stop golfing, bowling, fishing and gardening. He states
> that he can walk 1/2 a mile and can lift 10 lbs. He
> takes only over the counter pain medications. He remains
> able to take care of his personal needs and drive. The
> claimant's statements regarding his functional
> limitations are partially credible.

18

(Tr. 29.)

Social Security regulations provide that although state agency physicians may not have the opportunity to examine a claimant, they are specially trained in disability determinations and their opinions derived from review of the claimant's file are to be treated as medical evidence. See Poulos v Comm'r of Soc. Sec., 474 F.3d 88, 93, n.2, *quoting* 20 C.F.R. § 404.1527(f) ("State agency physicians and psychologists are considered to be 'highly qualified physicians and psychologists who are also experts in Social Security disability evaluation,' and the ALJ must consider their findings as opinion evidence.") In fact, an ALJ may rely on the opinion of a state agency physician when that opinion is consistent with the record. *See* Jones v. Sullivan, 954 F.2d 125, 128-129 (3d Cir. 1991).

The weight to be given to a non-examining physician's opinion is determined by the same standard as is used in weighing the opinion of a treating physician, including consistency with other evidence in the record and supportability. 20 C.F.R. § 404.1527(f). Here, however, we find no medical evidence which would support the state agency physician's conclusion that Plaintiff could lift and carry 50 pounds on occasion and lift and carry 25 pounds frequently,[13] despite his degenerative disk disease.

_____

[13] Defendant refers to this as indicative of the ability to perform heavy work. See, e.g., Defendant's Brief in Support of Motion for Summary Judgment, Docket No. 14, at 10 and 13. This actually

The ALJ noted in his decision that he saw "no indication in the record that the claimant could not perform light work." (Tr. 16.) He especially relied on Dr. Bookwalter's examination in October 2001 which revealed that Mr. Middlemas was "neurologically intact," the lack of evidence of gait disturbance, "normal bulk, strength and tone in all groups tested," no evidence of spondylolysis or spondylolisthesis, and evidence of chronic S-1 radiculopathy on the left without acute findings or evidence of instability." (Tr. 16.) The ALJ omits references to the fact that at the same time, Mr. Middlemas evidenced "visible vesiculations of the left calf," pulling and radicular pain down the left leg on straight leg raising, and "reflexes at +1 at both knees and ankles." (Tr. 145.) The comment about "no gait disturbance" was made in the context of discussing Mr. Middlemas's back pain related to his developing kidney disorder in October 2001, not the effects of his degenerative disk disease. (Tr. 148.) At that same examination, Dr. Bookwalter noted a "diminished range of motion in his back, L5 and S1 hypalgesia[14] on the left," reflexes which were symmetric except for an absent ankle jerk, and obvious muscle twitches in the calf muscles of his left leg. An MRI revealed "post-operative changes at L5-S1 and degenerative changes at L4-L5

reflects the ability to perform medium work. See 20 C.F.R. § 404.1567(c). Nowhere in the decision does the ALJ explain why he rejected the state-agency physician's opinion on this point.

[14] Hypalgesia is defined as diminished sensitivity to pain. See medical dictionary at Medline Plus.

20

with a slight bulge to the left," but nothing which required additional surgery. What is unclear from this summary of the medical evidence from October-November 2001 is how it supports the ALJ's conclusion that Plaintiff could perform light work, but could not, for instance, perform medium work as the state-agency physician had found.

As Plaintiff points out, an ALJ may not make speculative inferences from the medical reports or offer his own lay opinion. (Plf.'s Brief at 6-7, *see also* Morales, 225 F.3d at 317 ("an ALJ may not make speculative inferences from medical reports" and may not rely on "his or her own credibility judgments, speculation or lay opinion") (internal quotation omitted.)) Moreover, the RFC assessment must "be accompanied by a clear and satisfactory explanation of the basis on which it rests." Fargnoli, 247 F.3d at 41. While it is the provenance of the ALJ to weigh the evidence, he must give some indication of the evidence which he rejects and his reasons for doing so. Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 121 (3d Cir. 2000); *see also* SSR 96-8p. We recognize that an ALJ need not address or analyze every piece of evidence which comes before him. *See* Fargnoli, 247 F.3d at 42 (although the ALJ need not make reference to every relevant piece of information in the record, he must "consider and evaluate the medical evidence in the record consistent with his responsibilities under the regulations and case law.") Here, however, the ALJ

failed to acknowledge significant portions of the evidence, much less explain why he rejected Plaintiff's statements regarding the duration, intensity and effects of back and kidney pain on his ability to perform work-like functions. "In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981).

We recognize that none of his treating physicians intimated what level of work, if any, Mr. Middlemas was capable of performing, and there is no evidence such as a physical therapy consultation which might shed objective light on this question. However, as the United States Court of Appeals for the Third Circuit has recently indicated,

limitations that are asserted by the claimant but that lack objective medical support may possibly be considered nonetheless credible. In that respect the ALJ can reject such a limitation if there is conflicting evidence in the record, but should not reject a claimed symptom that is related to an impairment and is consistent with the medical record simply because there is no objective medical evidence to support it.

Rutherford, 399 F.3d at 554, citing Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999), and Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1992) (internal quotations omitted).

Moreover, an ALJ may not ignore an entire line of testimony that is contrary to his decision. Phillips v. Barnhart, No. 03-2236, 2004 U.S. App. LEXIS 4630, *14, n.7 (3d Cir. Mar. 10, 2004) (written evaluation of all the evidence is not required, but the ALJ must articulate his analysis of a particular line of

22

evidence at some minimal level.) Nor may the ALJ "pick and choose" among the evidence, selecting only that which supports his ultimate conclusions. *See* Morales, 225 F.3d at 318 (an ALJ may not simply rely on "the pieces of the examination reports that supported [his] determination," while excluding other evidence.)

There is abundant subjective evidence offered by Mr. Middlemas indicating he is unable to perform any level of work on a sustained basis due to chronic back and kidney pain. It is impossible to determine from the ALJ's decision why he rejected this evidence and concluded instead that Plaintiff could work at the light level. In fact, he acknowledged that if Mr. Middlemas could only perform sedentary work, he would "grid out" (Tr. 391), meaning that the combination of his age and limitations would establish that he was presumptively disabled.

We conclude that in the absence of any explanation as to how the ALJ arrived at Plaintiff's residual functional capacity and the absence of any substantive discussion of the effect of pain on that determination, remand is necessary for further consideration beginning at step four of the analysis.

2. *The ALJ's hypothetical question:* At the hearing, the ALJ posed the following question to the vocational expert:

. . . Let's assume we have an individual 56 years of age, high school education, work experience you've defined and described. Let's assume that he's capable of light work, but he would need to be in reasonable proximity of restroom facilities, reasonable proximity meaning . . . you can reach a restroom within a minute or two from his

23

work station. Obviously he can't return to his prior work [as a steel mill laborer] but are there other jobs such an individual as I described could perform?

(Tr. 390.)

The VE replied that such a person could work at a number of unskilled light jobs, specifically a sorter, an order caller or a marker, all of which existed in significant numbers in the national economy. (Tr. 390.)

The ALJ's conclusion that the only non-exertional limitation associated with Plaintiff's retroperitoneal fibrosis was the need to have restroom facilities nearby is further reflected in his finding that Mr. Middlemas

has urinary tract problems, but most seem to be related to a need to be reasonably close to a restroom facility. . . The undersigned sees no frank exertional limitations related thereto prior to the date last insured.

(Tr. 17.)

Plaintiff argues that the hypothetical question was deficient because it not only assumes he could perform work at a level which is not supported by the evidence, it does not include the limitation that he would have to use the restroom at an unusually high frequency and ignored any limitations due to his pain. (Plf.'s Brief at 12-14.) Again, we agree.

Mr. Middlemas testified, and there is no medical evidence to the contrary, that although he did not suffer from incontinence, he needed to urinate urgently "about every hour and a half." (Tr. 386.) As Plaintiff points out, the question therefore is not only

24

how near the restroom facilities might be, but how often he needs to use them. That is, while having a restroom nearby would accommodate the urgency of Mr. Middlemas's need to urinate, the more critical limiting factor is that he would need to take a break to do so on a frequency that might not be tolerated by an employer. A proper hypothetical question would have taken this time factor into account as well as the mere physical proximity of the facilities. The ALJ also failed to inquire about the effect chronic kidney, back and leg pain would have on an individual's ability to perform any of the jobs proposed by the VE, a factor which is well-established in the medical record.

It has long been the rule in this Circuit that a vocational expert's answer to a hypothetical question may be considered substantial evidence only if the question incorporates "all of a claimant's impairments that are supported by the record." Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987). The omissions noted above require further consideration on remand.

## V.  FURTHER PROCEEDINGS

Under 42 U.S.C. § 405(g), a district court may, at its discretion, affirm, modify or reverse the Secretary's final decision with or without remand for additional hearings. However, the reviewing court may award benefits "only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the

25

plaintiff is disabled and entitled to benefits." Krizon v. Barnhart, 197 F. Supp.2d 279, 291 (W.D. Pa. 2002), *quoting* Podedworney v. Harris, 745 F.2d 210, 222 (3d Cir. 1984).

Here, we are not convinced that the evidence as a whole leads to the inevitable conclusion that Plaintiff is entitled to benefits. However, we find the failure of the ALJ to clearly explain his residual functional analysis and why he rejected Plaintiff's testimony and reports regarding the extent and intensity of his chronic pain to be significant omissions which require remand for clarification. Similarly, the omission of any limitations resulting from pain from the hypothetical questions makes the ALJ's reliance on the vocational expert's testimony at step five of the analysis potentially suspect, as does the omission of any consideration for the need to take short breaks at 90-minute intervals. We therefore find that this case should be remanded for further consideration consistent with the analysis herein.

An appropriate order follows.

March ___3___, 2009

William L. Standish
United States District Judge